UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

Michael Robins,

    *Plaintiff,*

v.

    No. 24 CV 4185

Elite Line Services,

    Judge Lindsay C. Jenkins

    *Defendant.*

MEMORANDUM OPINION AND ORDER

Michael Robins filed this lawsuit against his former employer Elite Line Services alleging race discrimination and retaliation under Title VII, 42 U.S.C. § 2000e. Defendant now moves for summary judgment. Because Robins presents no evidence that would allow a reasonable jury to find in his favor, the motion is granted.

## I.    Background

The court draws on the parties' Local Rule 56.1 statements to recount the facts, which are undisputed except where otherwise noted. [Dkts. 36, 41.] The court views the record in the light most favorable to Robins. *See Johnson v. Accenture LLP*, 142 F.4th 536, 540 (7th Cir. 2025).

Daifuku Services America Corporation, formerly known as Elite Line Services, is a service provider of automated material handling solutions for companies like Amazon. Among other things, it provides equipment maintenance services at Amazon facilities across the United States. [Dkt. 36, ¶ 1.][1] One of those facilities is located on the south side of Chicago, and was the facility where Michael Robins was assigned while employed by Daifuku. [*Id.*, Dkt. 1, ¶ 10.]

Robins was hired as a Maintenance Tech III in 2020. [Dkt. 36, ¶ 21.] At hiring, Robins received several employment-related documents, including Daifuku's employee handbook and discipline policy, and the Amazon Safety Standards of Conduct. [Dkt. 36, ¶ 2.] As of 2022, Robins's direct supervisor was Tim Croak, who also supervised the only other Maintenance Tech III employee at the Chicago facility, Devin Jurishi. [*Id.*, ¶ 22.] Robins is Black; Jurishi is white. [Dkt. 1, ¶¶ 11, 18.] Robins's son Alonzo Robins ("Alonzo") was also employed by Daifuku at the same Chicago facility. [Dkt. 41, ¶ 7.]

---

[1]    Citations to docket filings generally refer to the electronic pagination provided by CM/ECF, which may not be consistent with page numbers in the underlying documents.

Before summarizing events from 2022 that eventually led to this lawsuit, some background is necessary. In the fall of 2021, Jurishi and Alonzo were texting over their personal cell phones. In one message, Jurishi sent Alonzo a link to Jurishi's YouTube page. The link showed a video of Jurishi singing a Tupac Shakur song and repeatedly using the N-word in the video. [Dkt. 36, ¶ 56.] This did not go over well. Alonzo shared this information with others, including his father and another Black Daifuku employee named James Morgan. [*Id*.] At an unspecified later date, Alonzo and James Morgan reported this to Dominique Washington, an Amazon HR employee. [Dkt. 41, ¶ 8;[2] Dkt. 29-3 at 65.]

Naturally, Robins found the video offensive and discriminatory. At his deposition, he testified that sometime after Alonzo and James Morgan made their reports to Amazon, Dominique Washington reached out to Robins asking to be connected with someone in Daifuku's HR department. [*Id*. at 65; Dkt. 41, ¶ 8; Dkt. 36, ¶ 56.]

Events key to this lawsuit occurred on March 9, 2022. According to Robins, he told Croak that Jurishi was wearing jeans, which are not proper Personal Protective Equipment as required by Daifuku's employee handbook and discipline policy. [Dkt. 36, ¶ 6; Dkt. 29-2 at 78 ("attire and grooming" section); at 106 (discipline policy).] According to Robins, when Jurishi learned of this, Jurishi reported a series of safety violations by Robins that occurred the same day. [Dkt. 41, ¶ 4.] Jurishi's reporting, Robins says, was retaliatory and racially motivated and eventually resulted in Robins being placed on leave and later terminated.

According to a written statement Jurishi provided to Daifuku, on March 9, Jurishi was assigned a project that entailed removing and replacing a broken groove roller located on an elevated conveyor. [Dkt. 36, ¶ 30; Dkt. 29-2 at 157.] Because the conveyor was located in a high up, hard to reach area, the project required two technicians to complete: one person to operate an aerial lift to access the broken grove roller and a second person to serve as a spotter. [*Id*.] Robins operated the aerial lift while Jurishi spotted from a diverter platform. [*Id*., ¶ 30.]

Before an employee begins any task, he must complete a Pre-Task Plan, an electronic form that assesses and manages risks to employees for the task. [Dkt. 29-2, ¶ 24; Dkt. 36, ¶ 12.] Based on the information the employee provides, the PTP generates "tailored safety instructions, among other guidance, that the employee

---

[2]     Robins cites to several facts in his Local Rule 56.1 statement of additional facts, without citing to record evidence in support of the asserted facts. Or he cites to his complaint, which is not evidence. [*See, e.g.*, Dkt. 41, ¶¶ 4, 6, 17, 20.] Because he did not comply with requirements of L.R. 56.1, the court disregards those facts. A party who fails to comply with Local Rule 56.1 does so at their own peril. *Wilson v. Kautex, Inc.*, 371 F. App'x 663, 664 (7th Cir. 2010) ("[S]trictly enforcing Local Rule 56.1 was well within the district court's discretion….") (cleaned up).

must follow to help mitigate potential hazards while performing the project or task." [Dkt. 36, ¶ 12.] Failure to complete this process before a task begins is a violation of Daifuku's discipline policy. [Dkt. 29-2 at 105.] Robins admits that the discipline policy so provides, but he disputes whether the rule was consistently enforced in practice. It was common, he says, for technicians to complete PTPs after starting or before finishing a task. [Dkt. 36, ¶ 12.] It's undisputed that Robins's PTP log shows that he completed a PTP after the repair work was complete. [*Id.*, ¶ 46.]

In certain circumstances, Daifuku required employees working at heights greater than four feet to wear certain PPE equipment. [Dkt. 36, ¶¶ 7–8.] An employee working at heights greater than four feet was not required to wear a fall harness so long as there were guardrails around him that provided fall protection. If, however, there were no guardrails or other fall protection available when working up high, the employee had to wear a fall harness for safety. [*Id.*] Robins admits all of this.

Before beginning the repair, Jurishi asked Robins if he had his safety gear, but Robins did not respond. [Dkt. 36, ¶ 30(b).] Robins got into the aerial lift without a hard hat or a bump cap and maneuvered the lift over to the elevated conveyor. [*Id.*] Neither man was wearing a fall harness. [Dkt. 41, ¶ 1.]

According to the Amazon Safety Standards of Conduct, before performing work on a conveyor, which is considered a hazardous energy situation, all technicians must perform a lock-out-tag-out safety procedure designed to deenergize the conveyor. Where more than one technician is working on a conveyer, Amazon's Safety Standards require each technician to put his own tags and locks onto the conveyor's control boxes before starting work, something the parties refer to as a group lock-out-tag-out. Failing to do so is considered a Category 1 offense under Amazon Safety Standards and a Group 4 violation of Daifuku's discipline policy. [Dkt. 29-2, ¶ 23; p. 107, ¶ 17; p. 111.] Both a Category 1 violation and a Group 4 violation subject employees to termination for the first offense. [Dkt. 36, ¶ 11.]

Jurishi's written statement about the incident relayed that he performed the lock-out-tag-out procedure to de-energize the conveyor. [Dkt. 29-2 at 157.] He "warned" Robins to do the same, but Robins ignored Jurishi. [*Id.*] Once he reached the conveyor, Robins climbed out of the aerial lift and on top of the conveyor, and began jumping directly on top of the raised conveyor rollers. [Dkt. 36, ¶ 30; Dkt. 29-2 at 157.] Jurishi was still standing on the diverter platform. Essentially, the two men were next to each other—Robins was on top of the conveyor and Jurishi was on the diverter platform with access to the top of the conveyor. [Dkt. 29-2 at 148.] Again, Robins disputes none of this.



A Safety Manager investigated Jurishi's report, a process that entailed reviewing witness statements and CCTV videos or pictures when available, as well as any relevant work forms, such as PTPs. [Dkt. 36, ¶ 34.] After reviewing CCTV video of Robins and Jurishi and other materials, the Safety Manager prepared an incident report dated March 10 that included screenshots of the relevant CCTV video, including the one above. [Dkt. 29-2 at 145–51.] This review included a report of a second violation by Robins reported by Croak. [Dkt. 36, ¶ 28–30.] According to Croak's statement, earlier in the day he observed Robins wearing pants with a hole in them, something that, like Jurishi's jeans, violated Daifuku's PPE requirements. [Dkt. 29-2 at 13, ¶ 40.] According to Croak's statement, he told Robins he could not work on the floor while wearing the pants. [Dkt. 29-2 at 137.]

According to the Safety Manager's incident report, Robins committed several safety violations during the conveyor incident, including failure to wear head protection when operating the lift; failure to perform his half of the lock-out-tag-out procedure; failure to complete a PTP in advance of the project; failure to wear adequate gear, including adequate PPE pants when performing an electrical task on the conveyor; and climbing out of the lift and onto the conveyor, including without a fall harness. [*Id.*; dkt. 37, ¶ 35–37.] Regarding this last violation, it's undisputed that Robins's failure to wear a fall harness while he was inside the aerial lift was not a violation of any rule or policy. [Dkt. 36, ¶¶ 40, 41.] But Daifuku concluded that Robins committed a Category 1 safety violation by stepping out of the lift and onto the top of the conveyor, including by doing so without a fall harness. [*Id.*]

Robins does not dispute that once on top of the conveyor, it was a safety violation to be in that position without a harness: he was high up and there were no guardrails on the conveyor. [*Id.*, ¶ 41.]

It is undisputed that the incident report did not identify any safety violations by Jurishi. [Dkt. 36, ¶ 39.]

The incident report concluded that by failing to perform his half of the lock-out-tag-out procedure, climbing onto a conveyor, and failing to wear a fall harness while on the conveyor, Robins was subject to termination at the first offense. [Dkt. 36, ¶ 38.] Robins admits that the listed violations qualified for termination, but he disputes whether the violations were consistently enforced in practice. Supervisors routinely observed technicians break the rules, he explains, including the lock-out-tag-out procedure and climbing onto conveyors or other elevated positions without a fall harness, but those employees were not disciplined or terminated. [Dkt. 36, ¶ 38; Dkt. 41, ¶ 3.] Robins also was never warned, counseled, or retrained regarding any of his safety violations. [*Id.*]

Following all of this, Daifuku placed Robins on "decision-making leave," on March 11. [Dkt. 36, ¶ 42.] The following day, March 12, Robins provided a written statement to Human Resources about the events of March 9. [Dkt. 29-2 at 154.] In sum, he explained that at the time of the incident, the conveyor was not operational because it had already been locked out by Jurishi, though Robins admitted that he forgot to perform his part of the lock-out-tag-out procedure. He explained that he did not have a bump cap or a hard hat because they made his bald head feel cold. He admitted that he climbed out of the aerial lift and onto the top of the conveyor without a fall harness, but explained that he didn't have a harness with him because he didn't need one to operate the lift. He also acknowledged the hole in his pants and that Croak told him to "wear better PPE," but added that Jurishi also hadn't been wearing the proper pants at an earlier point in the day. [*Id.*; dkt. 36, ¶ 44.]

Robins's written statement also included allegations of race discrimination and retaliation. Among other things, Robins explained that he was the victim of race discrimination, harassment and retaliation from Jurishi and Croak following Robins's report to Croak that Jurishi had been wearing jeans. Robins also described the YouTube video Jurishi sent Alonzo a few months before that showed Jurishi performing a song voice over while repeatedly using the N-word. [Dkt. 29-2 at 154.] The statement also described how other employees had reported the behavior to Amazon's Dominique Washington and that a few days later, Washington contacted Robins asking to be connected with Daifuku's HR department. [*Id.*]

It is undisputed that Robins's March 12 report was the first time that Robins reported any race discrimination, harassment or retaliation to Daifuku.[3]

Donna Stancy, who works in Daifuku's HR department, investigated the discrimination claims, including by interviewing Robins on March 15. Robins reiterated during that conversation that he had been the victim of race discrimination and retaliation by Croak and Jurishi. [Dkt. 36, ¶¶ 50–51.]

Stancy also interviewed Jurishi, Croak, Morgan, Alonzo, and Dominique Washington of Amazon concerning Robins's discrimination claims. [*Id.*, ¶ 53.] Ultimately, she concluded that Robins's claims of discrimination, retaliation, and harassment were unfounded. [*Id.*, ¶ 5-55; Dkt. 29-2 at 187–91.] Regarding Jurishi's YouTube video, she concluded that Jurishi's use of the N-word was not directed at Robins and that Robins had not been the recipient of the video. [Dkt. 36, ¶ 57.] Regarding the safety violations from March 9, she concluded that placing Robins on leave was justified given "the severity of Plaintiff's situation, *i.e.* climbing out of the aerial lift and on top of the conveyor without a fall harness." [*Id.*, ¶ 60.]

All HR termination recommendations must be approved by a group of eight Daifuku decision-makers; Croak is one of the eight. [Dkt. 36, ¶ 62.] Stancy submitted her termination recommendation to the group who approved Robins's termination after reviewing the investigations into the events of March 9 and Robins's discrimination claims. [*Id.*, ¶¶ 62, 66; Dkt. 29-2 at 4, ¶ 7.] All eight decision-makers were required to approve the decision to terminate Robins, and all eight approved the decision effective April 28, 2022. [Dkt. 36, ¶¶ 64, 69.] Stancy called Robins and relayed the decision to him in a phone call that was recorded, though Stancy would not reveal what corrective action was or was not taken in response to his allegations of race discrimination and retaliation. [Dkt. 43 (audio recording).]

In November 2022, Robins initiated a charge of discrimination with the Equal Employment Opportunity Commission alleging race discrimination and retaliation. [Dkt. 1, ¶ 5.] This lawsuit followed.

---

[3] Robins's attempts to dispute this timing are improper and therefore disregarded. In response to Daifuku's statement at paragraphs 47 and 52, Robins states that he "reported racial discrimination to Dominique Washington on March 4, 2022." [Dkt. 36, ¶¶ 47, 52.] But he cites no record evidence controverting Daifuku's assertion that the first reports of discrimination from Robins to Daifuku occurred on March 12. [*Id.*] To the extent he has failed to properly dispute the asserted fact, it is deemed admitted. L.R. 56.1(e)(3) ("Asserted facts may be deemed admitted if not controverted with specific citations to evidentiary material."); *Keeton v. Morningstar*, Inc., 667 F.3d 877, 884 (7th Cir. 2012) (where that party has failed to create a genuine dispute, the fact is deemed admitted).

## II.      Legal Standard

Summary judgment is proper where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see also Birch|Rea Partners, Inc. v. Regent Bank*, 27 F.4th 1245, 1249 (7th Cir. 2022). The court construes the evidence in the light most favorable to the non-moving party, giving him the benefit of all reasonable inferences. *Lesiv v. Illinois Central Railroad Co.*, 39 F.4th 903, 911 (7th Cir. 2022). Defeating summary judgment requires evidence, not mere speculation. *See Weaver v. Champion Petfoods USA Inc.*, 3 F.4th 927, 934 (7th Cir. 2021).

## III.      Analysis

### A.      Race Discrimination

Count One alleges race discrimination based on Daifuku's enforcement of its "safety policies selectively along racial lines" arising out of the conveyor incident on March 9. [Dkt. 39 at 3.] Robins argues that both he and Jurishi "performed maintenance work on a conveyor system more than four feet above the ground" without wearing a fall harness and that despite identical conduct, only Robins was disciplined and terminated. [*Id.* at 4.]

A plaintiff seeking to recover for disparate treatment under Title VII must prove at trial, by a preponderance of the evidence, that their race caused the challenged adverse employment action. *Carson v. Lake Cty., Indiana*, 865 F. 3d 526, 532 (7th Cir. 2017).

Under Title VII, an employer may not "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). An employer violates Title VII if it "intentionally relies in part" on an individual employee's membership in a protected class when the employee makes an adverse employment decision. *Bostock v. Clayton Cnty., Georgia*, 590 U.S. 644, 659 (2020). Put differently, "if changing the employee's" protected characteristic "would have yielded a different choice by the employer," then "a statutory violation has occurred." *Id* at 659–60.

To survive summary judgment on his race discrimination claim, the record must contain sufficient evidence to permit a reasonable jury to conclude that Robins's race caused the adverse employment actions at issue. *Upchurch v. Indiana*, 146 F.4th 579, 586 (7th Cir. 2025). The fundamental question is whether the evidence would permit a reasonable factfinder to conclude that Robins's race "caused the discharge

or other adverse employment action." *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016). The evidence "must be considered as a whole, rather than asking whether any particular piece of evidence proves the case by itself." *Ortiz*, 834 F.3d at 765; *Wince v. CBRE, Inc.*, 66 F.4th 1033, 1040 (7th Cir. 2023).

A plaintiff may either prove discrimination in this holistic fashion under *Ortiz*, or rely on the *McDonnell Douglas* burden-shifting framework, "which gives the plaintiff the initial burden to establish a prima facie case of discrimination, after which the burden shifts to the defendant to provide a legitimate justification, before finally shifting back to the plaintiff to establish that such justification was pretextual." *Wince*, 66 F.4th at 1040 (cleaned up); *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973); *see also Lewis v. Ind. Wesleyan Univ.*, 36 F.4th 755, 759 (7th Cir. 2022).

Robins does not present his arguments using the burden-shifting framework of *McDonnell Douglas*, so the court evaluates the evidence as a whole. *Ortiz*, 834 F.3d at 766. And where, as here, the employer has offered a nondiscriminatory explanation for its action, a Title VII claim turns on whether there is sufficient evidence for a reasonable jury to conclude that the explanation is pretext for illegal discrimination. *Vassileva v. City of Chicago*, 118 F.4th 869, 874 (7th Cir. 2024) ("We start and end with the evaluation of pretext, without asking whether Vassileva has established a *prima facie* case of discrimination under the burden-shifting framework created in *McDonnell Douglas* [], because Vassileva has chosen to proceed under *Ortiz*. Furthermore, even if a plaintiff uses the *McDonnell Douglas* framework to present evidence, where a defendant offers a nondiscriminatory explanation for its employment decision, as here, "the prima facie case and pretext inquiries often overlap," so courts "may skip the analysis of a plaintiff's prima facie case and proceed directly to the evaluation of pretext."); *Upchurch*, 146 F.4th at 587.

"Pretext is '[a] lie, specifically a phony reason for some action,' not 'just faulty reasoning or mistaken judgment on the part of the employer." *Napier v. Orchard Sch. Found.*, 137 F.4th 884, 892 (7th Cir. 2025). That is, pretext is not shown when the employer "honestly believed" the reason for its decision. *Anderson v. Street*, 104 F.4th 646, 654 (7th Cir. 2024); *see also Cunningham v. Austin*, 125 F.4th 783, 789–90 (7th Cir. 2025).

Daifuku offers nondiscriminatory explanations for its decision to place Robins on leave and then terminate him: he committed (and admitted to committing) multiple safety violations on March 9 during the conveyor incident. [Dkt. 28 at 6.] Among other things, he was not wearing head protection when operating the lift; he failed to perform his half of the lock-out-tag-out procedure; he climbed out of the lift and onto the conveyor and did so without wearing a fall harness, and he did not complete a PTP before beginning the work.

8

Robins's pretext arguments are, at best, undeveloped. First, he points to HR's "selective acceptance of statements from Croak and Jurishi—the subjects of Plaintiff's complaint—without interviewing neutral witnesses undermines Defendant's credibility." [Dkt. 39 at 4–5.] He argues that HR admitted during the termination call that there had been "race retaliation" but Stancy refused to disclose what corrective action was taken. Her concealment, he says, coupled with Daifuku's decision to terminate him anyway, supports pretext. [*Id.*]

This evidence does not amount to pretext. First, it's undisputed that Stancy interviewed several witnesses, not just Croak and Jurishi. [Dkt. 36, ¶ 53 (not disputing that Stancy interviewed Robins, Alonzo Robins, Morgan, and Dominique Washington as well as Croak and Jurishi.] Second, Robins fails to explain how Stancy's decision not to reveal Daifuku's corrective action decision in response to the report of discrimination demonstrates a weakness, implausibility, inconsistency, or contradiction that amounts to pretext for racial discrimination. *Saud v. DePaul*, 154 F.th 563, 569 (7th Cir. 2025).

Next, Robins appears to invokes comparator evidence, though his brief says only that "disparate treatment of similarly situated employees is sufficient to support an inference of discrimination," without further elaboration. [Dkt. 39 at 4.] The court considers this argument not to evaluate whether Robins made a *prima facie* case under *McDonnell Douglas*, but rather because "comparator evidence and selective enforcement of an employer's rules" are relevant to a pretext analysis. *Napier*, 137 F.4th at 894.

For a reasonable jury to draw an inference of pretext from evidence that the employer treated another employee differently, the comparator must be "directly comparable to the plaintiff in all material respects." *Upchurch*, 146 F.4th at 588. At summary judgment, "a plaintiff must usually show that the comparators (1) dealt with the same supervisor, (2) were subject to the same standards, and (3) engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." *Id.* Though this is "usually a question for the fact-finder," summary judgment is appropriate when "no reasonable fact-finder could find that plaintiffs have met their burden on the issue." *Coleman v. Donahoe*, 667 F.3d 835, 846-847 (7th Cir. 2012).

Here, the first two factors are not in dispute. Both Robins and Jurishi were Maintenance Tech IIIs who reported to Croak and they were subject to the same standards and policies. Regarding the third factor, "[i]f a comparator engaged in equivalent or more egregious conduct than the plaintiff but received a lighter punishment, or none at all, that satisfies the inquiry." *Dunlevy v. Langfelder*, 52 F.4th 349, 354 (7th Cir. 2022). "The only question is whether the two men's conduct was of 'comparable seriousness,' *i.e.*, did they engage in similar—not identical—conduct to qualify as similarly situated." *Id.*

9

No reasonable fact finder could conclude that Robins and Jurishi engaged in conduct of comparable seriousness. Robins admits he committed several terminable violations on March 9, but the record does not reveal the same about Jurishi.

Robins's argument focuses on the fact that neither man was wearing a fall harness yet only Robins was cited for this violation and later terminated. [Dkt. 39 at 3-4.] But he admits that when working from a height greater than four feet, employees were not required to wear a fall harness so long as there were safety guardrails to provide fall protection. [Dkt. 36, ¶¶ 7–8 (admitted).] That's the reason why Robins's work from inside the lift without a fall harness was not a safety violation: he was up high but the lift had guardrails. It's also the reason why Jurishi was not cited—he was up high on a diverter platform with guardrails. [*Id.*]

To be sure, Robins admits that it was only when he left the lift and stepped on top of the conveyor that he was required to wear a fall harness—now, he was high up with no guardrails. [Dkt. 36, ¶ 41 (admitted).] Jurishi never left the diverter platform.

Robins does not grapple with these facts. At most, he points to his deposition testimony to suggest that the diverter platform did not have guardrails. [Dkt. 29-3 at 106; Dkt. 41, ¶ 13.] But as Daifuku observes, this testimony is belied by facts Robins admits, and by CCTV evidence. Robins does not dispute—let along point to specific evidentiary material that controverts—that "the CCTV Video and screenshots showed that the diverter platform on which Jurishi was working had yellow guardrails, which meant that Jurishi had fall protection even without a harness and was therefore not required to wear one." [Dkt. 36, ¶ 39; L.R. 56.1(e)(3)][4]

Even assuming a genuine dispute of fact existed about whether there were guardrails on the diverter platform, and even assuming Jurishi committed a violation by not wearing a fall harness but was not punished, the question is whether the employees engaged in conduct of comparable seriousness. *Dunlevy,* 52 F.4th at 354. As Daifuku points out, Robins committed multiple Category 1 violations. [Dkt. 28 at 7-8.] Fall harnesses aside, Robins admits he exited the lift and climbed on top of the conveyor; he admits that he did not perform his part of the lock-out-tag-out procedure; and he admits he was not wearing head protection. [Dkt. 36, ¶ 38.] Jurishi did not commit any of these violations, meaning Jurishi did not engage in conduct of comparable seriousness. *Reives v. Illinois State Police*, 29 F.4th 887, 892-893 (7th Cir. 2022).

---

[4]    At summary judgment, video evidence can only resolve a factual dispute where "there could be no reasonable disagreement about what the video depicts." *Kailin v. Vill. of Gurnee*, 77 F.4th 476, 481 (7th Cir. 2023). The screenshot of the CCTV video that's depicted above is nothing like the grainy, soundless video in *Kailin*, where "the entire video of the critical event last[ed] a mere six seconds" and "a reasonable juror might see different things in that inkblot of a blur." 77 F.4th at 482. This resolves any potential factual dispute that ordinarily would be for a jury to decide.

No doubt, Robins believes Daifuku was wrong for not disciplining Jurishi. But the material differences between Robins and Jurishi's conduct confirm that Jurishi is not "directly comparable to [Robins] in all material respects." *Saud*, 154 F.4th at 568. He is not a valid comparator, so placing Robins on leave and later terminating him, but not Jurishi, does not raise an inference of pretext.

Third, Robins points out that Croak was one member of the group of eight Daifuku decision-makers who approved Robins's termination after reviewing HR's investigation. [Dkt. 39 at 5.] Croak's involvement, Robins argues, "taints the process and supports a finding of discriminatory motive" and any alleged independence of HR's investigation "is contradicted by its reliance on the very individuals accused of misconduct." [*Id.*]

Though far from clear, Robins appears to press a cat's paw theory of proximate causation. The cat's paw theory applies in the employment discrimination context when "a biased supervisor, or a biased subordinate, who lacks decision-making power uses the formal decision maker as a dupe in a deliberate scheme to trigger a discriminatory employment action." *Sinha v. Bradley Univ.*, 995 F.3d 568, 574 (7th Cir. 2021). Proximate cause is established where an "investigation took the [biased subordinate or supervisor's] complaint into account without determining that the adverse action was, apart from the supervisor's recommendation, entirely justified or if the investigation relies on facts provided by the biased supervisor." *Gaines v. Dart*, 158 F.4th 829, 835 (7th Cir. 2025) (citing *Vesey v. Envoy Air, Inc.*, 999 F.3d 456, 462 (7th Cir. 2021). "Put more simply, a cat's paw theory cannot be credited if the employer believed it had independently sufficient reasons, such as corroboration of the allegations, to take the adverse action." *Id.*

Assuming Robins could show that Croak (as a biased supervisor) or Jurishi (as a biased subordinate) harbored discriminatory animus against Robins that prompted the investigation into the conveyor incident, his cat's paw theory fails because he has not presented sufficient evidence showing that their involvement in the investigation tainted the findings such that either of their animus proximately caused him to be placed on leave or terminated.

It's undisputed that a Safety Manager investigated the events of March 9 and, in addition to reviewing Jurishi and Croak's written statements, reviewed CCTV video of the incident and reviewed other files such as Robins's PTP log. [Dkt. 29-2 at 145–51.] Robins also does not dispute that he actually committed several safety violations that were terminable offenses. [Dkt. 36, ¶ 35–37, 40–41.] Likewise, as just discussed, Stancy conducted an independent investigation into Robins's claim of race discrimination and retaliation and concluded that the decision to place Robins on leave was warranted. [*Id.*, ¶ 60.] This undisputed evidence establishes the

11

investigations "broke any causal chain that might have extended from" possible discriminatory animus from Jurishi or Croak. *Gaines*, 158 F.4th at 837.

Finally, that Croak was one of the eight Daifuku decision-makers who approved Robins's termination is not fatal. The Seventh Circuit has explained that under the cat's paw theory, "the ultimate decisionmaker need not be a paragon of independence." *Id.* at 836. "All that is required is that the decisionmaker is not wholly dependent on a single source of information and conducts her own investigation into the facts relevant to the decision." *Id.*

Considering the evidence as a whole and eschewing any framework or formula, Robins has not come forward with evidence that would allow a reasonable juror to find that Daifuku's justification for placing him on leave or terminating him was pretextual. Even with all evidence in a pile, *see Ortiz*, 834 F.3d at 766, no reasonable jury could find in his favor.

Daifuku is entitled to summary judgment on the race discrimination claim.

## B. Retaliation Under Title VII

Count Two alleges retaliation under Title VII. To prevail on a Title VII retaliation claim, a plaintiff must prove (1) he engaged in activity protected by the statute, (2) he suffered an adverse employment action, and (3) a causal link between the protected activity and the adverse action. *Vavra v. Honeywell Int'l, Inc.*, 106 F.4th 702, 705 (7th Cir. 2024). Robins advances the theory that Daifuku retaliated against him by placing him on leave and later terminating him because he reported instances of race discrimination, harassment, and retaliation by Croak and Jurishi in his statement to HR on March 12.

"'Protected activity' is 'some step in opposition to a form of discrimination that the statute prohibits.'" *Ferrill v. Oak Creek-Franklin Joint Sch. Dist.*, 860 F.3d 494, 501 (7th Cir. 2017) (quoting *O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 631 (7th Cir. 2011)). Informal complaints can count. *Davis v. Time Warner Cable of S.E. Wisc., L.P.*, 651 F.3d 664, 674 (7th Cir. 2011). Regardless of the form of the complaint, though, it "must be about the [challenged] discrimination." *McHale v. McDonough*, 41 F.4th 866, 871 (7th Cir. 2022).

Here, there is no dispute that Robins engaged in protected activity when he reported race discrimination and retaliation in his March 12 written statement to HR. Robins also identified two adverse employment actions: the decision to place him on leave on March 11 and the decision to terminate him.

But he fails to demonstrate a causal connection between the discrimination and retaliation he reported on March 12 and any adverse action. To establish

causation in the retaliation context, Robins must "offer evidence that a retaliatory motive was a but-for cause of the challenged employment action, meaning that the adverse action would not have happened without the activity. *Johnson*, 142 F.4th at 543. He may point to circumstantial evidence, such as "suspicious timing, ambiguous statements of animus, evidence other employees were treated differently, or evidence the employer's proffered reason for the adverse action was pretextual." *Lewis*, 36 F.4th at 761. "Ultimately, the key question is whether a reasonable juror could conclude that there was a causal link between the protected activity or status and the adverse action." *Id.* (cleaned up).

Regarding the decision to place him on leave, it's undisputed that Robins first reported race discrimination and retaliation to Daifuku on March 12—the day after being placed on leave. [Dkt. 36, ¶ 42.] The record reveals no evidence of any protected activity by Robins before that date. To be sure, Alonzo and Morgan made reports of discrimination to Amazon prior to March 12, and in response, an Amazon employee reached out to Robins asking to be connected with someone in Daifuku's HR department. But there's no evidence of any complaint, informal or otherwise, by Robins to anyone at Daifuku before being placed on leave on March 11, including as of March 9.

Robins's brief appears to also suggest suspicious timing. [Dkt. 39 at 4.] No bright-line rule exists for showing a causal link, *Baines v. Walgreen Co.*, 863 F.3d 656, 666 (7th Cir. 2017), but "[t]he closer two events are, the more likely that the first caused the second." *Loudermilk v. Best Pallet Co.*, 636 F.3d 312, 315 (7th Cir. 2011) (inference of causality permitted where employee was discharged immediately after handing his supervisor a note detailing allegations of discrimination). To draw the necessary inference of retaliation based on suspicious timing, the time period between the protected action and the alleged adverse action must be "very close." *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001).

Here, even assuming the timing between Robins's written report on March 12 was close enough to the termination date in late April, "suspicious timing, alone, is generally insufficient to establish a retaliatory motivation." *Vavra*, 106 F.4th at 706. (cleaned up). Further, "any inference of causation supported by temporal proximity may be negated by circumstances providing an alternative explanation for the challenged action." *Id.* That is the case here.

By his own admission, Robins violated multiple safety rules, including several Category 1 offenses under Amazon Safety Standards and several Daifuku Group 4 offenses, any one of which was sufficient to terminate him. [Dkt. 36, ¶¶ 11, 44.] This means that Daifuku has come forward with a non-retaliatory reason for termination, and Robins presents no evidence to rebut that.

Ultimately, "to reach a jury on his retaliation claims, the evidence must permit a reasonable jury to draw a causal link between [the protected activity] and the adverse actions underlying [the] claims." *Upchurch*, 146 F.4th at 587. Robins fails to identify a link between his complaint of discrimination and retaliation to the adverse actions he identifies. The record does not show that his discrimination complaint caused him to be placed on leave or caused his termination.

Daifuku is entitled to summary judgment on the retaliation claim, too.

## IV. Conclusion

Defendant's motion for summary judgment is granted.

Enter: 24-cv-4185
Date: March 20, 2026

_____
Lindsay C. Jenkins

14